**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
***Newport News Division***

| | |
|---|---|
| FERGUSON ENTERPRISES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VICTAULIC COMPANY,<br><br>Defendant. | Civil Action No. 4:26-cv-140 |

*Serve:* Victaulic Company
c/o Corporation Service Company
100 Shockoe Slip, FL 2
Richmond, VA 23219

**COMPLAINT**

Plaintiff, Ferguson Enterprises, LLC ("Ferguson"), brings this action against Defendant Victaulic Company ("Victaulic"), and alleges as follows:

**NATURE OF THE ACTION**

1. Ferguson brings this action against Victaulic for breach of contract. Victaulic owes Ferguson millions of dollars in Rebates earned on Products that Ferguson purchased from Victaulic and Victaulic invoiced pursuant to the parties' Corporate Administrative Agreement and Corporate Rebate Agreement (together, the "Agreement"). Although Victaulic unilaterally terminated the Agreement as of April 3, 2026, all purchases at issue were invoiced prior to termination, and the Agreement expressly provides that "[t]he payment obligations of [Victaulic] . . . incurred prior to termination or expiration of this Rebate Agreement will survive any such termination or expiration."

2. For roughly forty years, Ferguson served as one of Victaulic's largest distributors, purchasing approximately $400 million in Products annually. The relationship was mutually beneficial for those many years, and Ferguson intended to continue selling Victaulic's Products indefinitely. However, because Ferguson exercised its right to also carry other brands of comparable products to meet the needs of its customers, Victaulic regrettably chose to unilaterally terminate the Agreement. While Victaulic was entitled to terminate, it was not entitled to walk away from its Rebate obligations for those Products purchased by Ferguson and invoiced by Victaulic during the Agreement's term, but not yet resold by Ferguson by the termination date.

3. Victaulic's pricing under the Agreement required Ferguson to pay higher upfront prices on Products purchased but, once such purchases were invoiced by Victaulic, Victaulic became unconditionally obligated to later pay Rebates to adjust and align the pricing to the parties' agreed net pricing structure. Per the payment mechanics used by the parties for decades, the amount of such Rebates has always been calculated and paid by Victaulic to Ferguson following Ferguson's shipment of the Products for resale to Ferguson's customers. As the Agreement plainly states, Rebates applicable to Ferguson's purchases from Victaulic "will be paid on Products: Invoiced," with no other condition or time limit on Victaulic's Rebate payment obligation.

4. Read together, Victaulic's unconditional Rebate payment obligation on invoiced Products and the Agreement's express provision that all such Victaulic payment obligations survive termination of the Agreement, there is no plausible alternative reading of the Agreement. Once Products purchased by Ferguson were invoiced by Victaulic, Victaulic incurred a fixed and unconditional obligation to pay all applicable Rebates on such Products. Although the specific timing and amount of Rebate payments depends on when Products are shipped by Ferguson for

resale, Victaulic's underlying payment obligation is not contingent on these events and expressly survives termination of the Agreement.

5. Yet, despite Ferguson's repeated efforts over several months to amicably resolve this dispute, Victaulic has continued to insist (without any coherent explanation or contractual support) that its Rebate payment obligations under the Agreement were cut off as of the April 3 termination date, and refuses to pay.

6. Victaulic's refusal to honor its explicit surviving Rebate payment obligations on millions of dollars of Products purchased by Ferguson and invoiced by Victaulic during the term of the Agreement constitutes a material breach of the parties' Agreement.

## PARTIES

7. Plaintiff Ferguson Enterprises, LLC is a limited liability company organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Newport News, Virginia. Ferguson's sole member is Ferguson US Holdings, Inc., a corporation organized and existing under the laws of the Commonwealth of Virginia with a principal place of business in Newport News, Virginia.

8. Victaulic is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 4901 Kesslersville Road, Easton, Northampton County, Pennsylvania 18040. Victaulic regularly sells Products, conducts other business in this District, and previously sold a substantial volume of such Products to Ferguson for resale to end customers in this District.

## JURISDICTION & VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the diversity of the parties. Ferguson is a citizen of the Commonwealth of Virginia, and Victaulic

is a citizen of Delaware and Pennsylvania. The amount in controversy far exceeds the jurisdictional threshold of $75,000 and is not less than $8 million.

10. Pursuant to its Order of Precedence provision referencing and prioritizing Ferguson's Purchase Order Terms and Conditions, the parties' Agreement also provides for exclusive jurisdiction for all actions relating to the Agreement between Ferguson and Victaulic in a court residing in the Commonwealth of Virginia.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff resides in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant is licensed to do business in, is doing business in, has agents in, and/or is found and transacts business in this District. Ferguson received Victaulic invoices, processed them, and remitted payment from its principal place of business in this District. In particular, pursuant to the Agreement, Victaulic sold more than one hundred million dollars of Products to Ferguson in the Commonwealth of Virginia between 2020-2025, much of which was resold to customers within this District.

12. This Court has personal jurisdiction over Defendant pursuant to the Agreement, as well as because it, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; and (b) purposefully directed its sales and commercial activities at this District through the Agreement, causing injury to the business or property of Ferguson in this District.

## STATEMENT OF FACTS

### A. Ferguson's Relationship and Agreement with Victaulic

13. For roughly forty years, Ferguson had served as a distributor of Victaulic's products ("Products"), which Victaulic supplies to distributors for resale throughout the United States in

order to be able to reach end users that are mostly contractors and other construction professionals. The Products are designed for use in construction and industrial projects, and are commonly used across a range of critical construction applications, including fire protection systems, HVAC systems, water treatment, industrial piping, plumbing, and mining and marine systems.

14. Ferguson and Victaulic had a longstanding commercial relationship governed by their annually renewing Agreement, most recently as of November 25, 2025, with the period of performance beginning January 1, 2026, pursuant to which Victaulic sold and Ferguson purchased Products for resale to contractors and other end customers throughout the United States.

15. Pursuant to the Agreement, Victaulic employed a pricing and rebate framework by which Victaulic initially charged, and Ferguson was required to pay, inflated upfront prices for Products. Ferguson's final net Product prices were ultimately determined based on application of a series of rebates, including, but not limited to, flat rebates, Special Pricing Form "SPF" pricing, and other incentives and rebates under the Agreement, many of which were reconciled and paid by Victaulic to Ferguson only following Ferguson's shipment of the subject Products to its retail branches and/or resale to end customers because their precise amount was not calculable until Ferguson's final cost could be determined upon resale to the end customers (the "Rebate" or "Rebates").

16. However, as soon as Victaulic invoiced Ferguson for such Products sold under the Agreement, the subject Rebates were earned, and Victaulic became unconditionally obligated to later reconcile and pay such Rebates back to Ferguson once sold by Ferguson to its customers. Payment of the Rebates comprised a substantial portion of such Products' initially inflated purchase prices and were a material component of the economic value of the commercial relationship to Ferguson.

17. The Agreement did not contain any exclusivity requirement. Victaulic was at liberty to, and did, sell its Products to other distributors, including Ferguson's competitors, and to select end customers, and there was no contractual restraint on Ferguson purchasing competing products from other suppliers. Indeed, Ferguson elected to carry other brands of comparable products in order to meet the needs of its customers. Ferguson was prepared to continue selling Victaulic's Products alongside those other brands, because Ferguson's priority has always been to offer its customers the best available options. Despite having no contractual right to exclusivity, Victaulic nonetheless unilaterally terminated the Agreement on this basis.

18. In December 2025, Victaulic notified Ferguson of its decision to unilaterally terminate the Agreement, without cause, with such termination becoming effective following the Agreement's notice period, as of April 3, 2026. Ferguson was disappointed by Victaulic's decision to end a mutually-beneficial, decades-long relationship, rather than allow customers the benefit of choice in the marketplace. The Agreement was and remains a valid and enforceable contract pursuant to which Victaulic sold Products to Ferguson and, as part of such sales, became obligated to pay Rebates to Ferguson for Products purchased and invoiced at initially inflated prices during the Agreement's term.

19. Although the Agreement was unilaterally terminated by Victaulic as of April 3, 2026, on May 15, 2026, Victaulic's Director of Sales Operations confirmed in an email that the explicit terms of the Agreement remain the controlling framework for the parties' Rebate obligations:

> Our Corporate Rebate Agreement and Corporate Administrative Agreement (collectively, the "Corporate Agreements") were entered into annually and serve as the foundation for both pricing terms and [Rebate] reconciliation processes. These documents are the definitive source for how credits and claims are to be handled.

Ferguson agrees. Victaulic's acknowledgment that the Corporate Agreements are "the definitive source" for rebate reconciliation was made six weeks after the Agreement's termination, confirming that the parties' rebate obligations did not end when the Agreement did.

20. Indeed, without Victaulic's Rebate payment obligations surviving termination of the Agreement, Ferguson would necessarily have been left with overpriced inventory regardless of when the Agreement had ended, costing Ferguson millions of dollars and prejudicing Ferguson's ability to compete for downstream resales of the same Products with other Victaulic distributors. Plainly, that is not what the Agreement contemplates or provides.

21. With respect to Victaulic's Rebate payment obligations based on such invoiced Product sales, the Agreement's relevant terms are clear and unambiguous:

22. The Corporate Rebate Agreement requires that the "Rebate <u>will be paid</u> on Products: Invoiced" (emphasis added). Thus, the Agreement's sole condition of Victaulic's Rebate obligation under the Agreement being incurred (*i.e.*, that it "will", not may, be paid) is that the subject purchase of Products has been invoiced by Victaulic to Ferguson. No time limitation is stated or applicable, and all other relevant restrictions were complied with by Ferguson.

23. Although different types of Rebates were subject to different calculation methodologies, all were earned upon invoicing by Victaulic and all are owed by Victaulic. Such Rebates either are already due to be paid or will become due once the subject Products are shipped by Ferguson for resale to Ferguson's customers.

24. Although many of the Products with outstanding Rebates were purchased by Ferguson pursuant to Victaulic's Special Pricing Forms, those SPFs only determined Victaulic's pricing and the period for which that pricing would be available for purchase. As Victaulic's Director of Sales Operations admitted to Ferguson (most recently in an email dated May 15, 2026),

Victaulic's SPFs are administrative documents that exist outside of the Agreement and cannot vary the provisions of the Agreement. Once a Product purchase was made by Ferguson within a SPF's applicable purchase period, and then invoiced by Victaulic, the terms of such purchase, including its applicable Rebates, became fixed and unconditional as provided by the Agreement. At that point, Victaulic became unconditionally obligated to reconcile the subject Rebate once it could be calculated (in part based on Ferguson's later shipment or resale to its customers) and so became due. This mandatory reconciliation process was and remains operationally implemented through Victaulic's SPF process in conjunction with Ferguson's Cost Override Entry System ("CORE"), which captures cost override contracts and subsequent sale information necessary to calculate the Rebates. Thus, while administrative SPF forms set the initial parameters and timing for Ferguson's purchases of Products, as both parties have repeatedly recognized, it is the Agreement itself that exclusively governs the applicability and survival of earned Rebates.

25. The Corporate Rebate Agreement also sets forth the reconciliation and payment mechanics governing how calculated Rebate amounts are to be trued up and paid by Victaulic to Ferguson.

26. The Agreement's Term and Termination section explicitly provides that "[t]he payment obligations of [Victaulic] . . . incurred prior to termination or expiration of this Rebate Agreement will survive any such termination or expiration." This survival clause, read together with the foregoing unconditional obligation that Rebates attributable to invoiced purchases "will be paid," establishes an unambiguous contractual obligation requiring Victaulic to pay all Rebates earned on all invoiced Products that were purchased by Ferguson during the Agreement's term, regardless of whether due to be paid before or after the Agreement's termination or expiration. In sum, Victaulic's Agreement Rebate obligations are incurred at the time of its invoicing of Products

purchased by Ferguson during the Agreement's term, and all such incurred obligations expressly survive following the Agreement's termination (or expiration).

27. Throughout the parties' relationship, Victaulic consistently reconciled and paid Rebates on Products that were invoiced during one annual Agreement period but not shipped or resold by Ferguson until after that period ended. Products invoiced by Victaulic during the final months of a given annual Agreement period routinely remained in Ferguson's inventory before shipment or resale, and Victaulic reconciled and paid the corresponding Rebates in the ordinary course without regard to whether the annual Agreement period had expired or a new Agreement period had commenced.

28. Finally, pursuant to the Agreement's Order of Precedence provision referencing and prioritizing Ferguson's Purchase Order Terms and Conditions, any dispute between Ferguson and Victaulic relating to the Agreement "shall be governed in all respects by the laws of the Commonwealth of Virginia …"

29. The Agreement's "Order of Precedence" establishes the hierarchy of controlling contract terms in the event of any conflict, starting with the parties' Corporate Administrative Agreement and Corporate Rebate Agreement, then the parties' separate Hold Harmless Agreement, and, where such agreements are silent or ambiguous, providing that Ferguson's purchase orders and Terms and Conditions of Purchase shall control (in that order). As a result, where the Agreement and other earlier referenced documents do not resolve any relevant issue, Victaulic's acceptance of Ferguson's purchase orders and their Terms and Conditions of Purchase in connection with its sale and invoicing of the subject Products requires that such ancillary provisions control.

30. Notwithstanding the foregoing clear and unambiguous Agreement provisions specifying Victaulic's unconditional Rebate payment obligations with respect to Products purchased and invoiced during the Agreement's term, and further providing that all such payment obligations explicitly survive termination or expiration of the Agreement, Victaulic has nonetheless expressly refused to pay such Rebates for Products resold by Ferguson after the April 3 termination date.

31. In sum, Victaulic has insisted, without basis, that because it unilaterally chose to terminate the Agreement, its Rebate payment obligations as to Products previously purchased by Ferguson and invoiced by Victaulic should somehow be cancelled or otherwise eliminated as of the termination date. This is squarely inconsistent with the terms of the Agreement.

**B. Victaulic's Breaches of Its Rebate Payment Obligations Under the Agreement Have Damaged and Will Continue to Damage Ferguson**

32. Victaulic's refusal to pay the referenced Rebates for Products purchased by Ferguson and invoiced by Victaulic during the Agreement's term constitutes a material breach of the Agreement.

33. As the foregoing Agreement provisions establish, such Rebates were earned as soon as the Products were invoiced during its term by Victaulic. Victaulic cannot simply cancel or set a new time restriction on such outstanding earned Rebates on Products previously purchased by Ferguson and invoiced by Victaulic just because it exercised its right to terminate the Agreement.

34. Under the Agreement's pricing structure, Ferguson was required to pay higher, inflated upfront invoice prices on Products purchased. However, once such purchases were invoiced by Victaulic, Victaulic became unconditionally obligated to reconcile and pay all Rebates when they became calculable and due following the Products' shipment or resale. No further

condition, contingency, or time limitation applies to Victaulic's payment obligations, which also expressly survived the termination or expiration of the Agreement.

35. While Agreement Rebates are thus earned upon invoicing, the precise amount of many of the Rebates cannot be calculated, and such Rebates accordingly cannot be reconciled and so do not become payable, until the corresponding Products are later shipped by Ferguson to its retail branch stores and/or resold directly to an end customer such that the resulting cost of goods can be quantified. This sequencing -- under which Victaulic's obligation to pay Rebates is incurred, fixed and unconditional at invoicing, but the amount owed cannot be finally calculated and so is not due to be paid until later shipment or resale -- is precisely why the Agreement expressly provides that Victaulic's payment obligations incurred prior to termination must survive any termination or expiration of the Agreement.

36. Since many Rebates earned (*i.e.*, invoiced) on Products purchased by Ferguson during the Agreement's term shortly before its termination or expiration (regardless of when that occurs) would necessarily not have been shipped or resold until after the termination date, such Products' corresponding Rebates would not have been calculable at that time. Those Rebates are still nonetheless owed and must be paid by Victaulic as they became calculable and so due, even following the April 3 termination date.

37. Indeed, that is precisely what has happened. Approximately $3.1 million of Rebates stemming from previously purchased and invoiced Products that were in Ferguson's inventory as of the Agreement termination date became due and payable following Ferguson's shipment of such Products for resale between April 3, 2026 and July 31, 2026. Ferguson also reasonably projects that an additional approximately $5 million of further Rebates stemming from the remaining Products in Ferguson's possession (all of which were purchased by Ferguson and

invoiced by Victaulic during the term of the Agreement) will become due upon their sale and shipment to Ferguson's customers over the following months.

38. Specifically, as of the end of the first quarter of 2026 (March 31, 2026, which was just before the Agreement's April 3, 2026 termination date), Ferguson had in its inventory approximately $30.3 million of Products (based on their aggregate purchase prices) that had been purchased by Ferguson and were invoiced by Victaulic during the term of the Agreement, for which Rebates had been earned but were not calculable because they had not yet been shipped and/or resold by Ferguson.

39. From April 3 through July 31, 2026, approximately $13,511,000 of such previously purchased and invoiced Products were sold to Ferguson's customers, such that the already earned Rebates became calculable and, based on their now known resale prices, fixed, outstanding and due to be paid by Victaulic. Such earned and outstanding Rebates owed to Ferguson by Victaulic pursuant to the Agreement, as of July 31, 2026, total approximately $3,100,831.

40. Ferguson has made due demand to Victaulic for payment of all Rebates under the Agreement, including the foregoing now due and owing $3,100,831 of Rebates. On June 17, 2026, Ferguson sent written demand to Victaulic asserting its entitlement to post-termination Rebates on Products invoiced during the Agreement's term. However, Victaulic has refused to pay such now overdue Rebates, asserting without basis and in contradiction of the Agreement's express provisions that its Rebate payment obligations could somehow have been extinguished by Victaulic's unilateral termination of the Agreement.

41. As of August 1, 2026, Ferguson still maintains an additional approximately $16.8 million of Products in its inventory that were also purchased and invoiced during the Agreement's term. Rebates on such Products remaining in inventory have been earned but are still not

calculable, and so are not yet due to be paid by Victaulic, because they have not yet been shipped or resold by Ferguson to its customers.

42. That some such Rebates are not yet due does not change the fact that Victaulic will be obligated to pay them promptly following Ferguson's shipment or resale of the previously purchased Products at issue. Although not now precisely calculable because the final cost of goods is not yet determined, the pending Rebates are reasonably projected, based on Ferguson's recent Rebates for similar Products, to total approximately $5 million.

43. Regardless of when the corresponding shipment or resale and final calculation with respect to the Rebates for such Products remaining in Ferguson's inventory occurs, Victaulic then becomes obligated to pay such Rebates promptly.

44. Ferguson has already demanded payment from Victaulic for the anticipated reconciliation of its already earned Rebates, but Victaulic has denied its continuing payment obligations. Once again, on June 4, 2026, Victaulic's Executive Vice President of Sales just asserted, without basis and in contradiction of the Agreement's express provisions, that it unilaterally "consider[s] the book closed on material reconciliation as of April 4th [2026]" based on its termination of the Agreement. Victaulic's foregoing refusal to reconcile and pay remaining Product Rebates promptly as they become due constitutes its anticipatory breach of such obligations under the Agreement.

45. In sum, Victaulic cannot avoid its unconditional obligations to pay Rebates on Products that were purchased and invoiced during the Agreement's term merely because the timing of shipment or resale of such Products is uncertain, and therefore the final calculation of such Rebate amounts either occurred or will occur after the Agreement's termination date. Indeed, the Agreement's survival of payment obligations provision exists, in part, precisely to preserve

Victaulic's obligation to pay Rebates earned prior to termination irrespective of when their shipment-driven calculation and reconciliation is ultimately completed.

**COUNT I**
**BREACH OF CONTRACT**

46. Plaintiff incorporates by reference and re-alleges the preceding allegations as though set forth herein.

47. As set forth above, the Agreement was and is a valid and enforceable contract pursuant to which Victaulic sold Products to Ferguson at initially inflated prices and, once such Product sales were invoiced, imposed on Victaulic clear, unconditional and expressly surviving Rebate payment obligations.

48. Pursuant to the Agreement's Term and Termination provisions, Victaulic was required to pay all Rebates related to Ferguson's purchases of Products that Victaulic invoiced prior to the effective date of the Agreement's termination, notwithstanding such termination or when, following termination, such Rebates became due.

49. Nevertheless, not only did Victaulic unilaterally terminate the Agreement but it also refused to pay, and purported to retroactively cancel, outstanding Rebates due to be paid to Ferguson based on previously purchased and invoiced Products. Some such Products have since shipped and/or been resold, and so such Rebates are now due and owing; other such Products remain in Ferguson's inventory, with Rebates that will become due once they ship and/or are resold to end customers. However, Victaulic's continuing Rebate payment obligation is clear and unambiguous as to both, and its refusal to pay Rebates on such Products as required by the Agreement constitutes a breach as to the former (Products for which Rebates are now due) and anticipatory breach as to the latter (Products for which Rebates are not yet due).

50. Victaulic's attempted cancellation of, and refusal to pay, the Rebates on Products purchased by Ferguson and invoiced by Victaulic pursuant to the Agreement during its term constituted, and continues to constitute, a breach of the Agreement and Victaulic's unambiguous payment obligations thereunder.

51. Ferguson performed all of its obligations under the Agreement.

52. As of the Agreement's termination date, Ferguson had already earned no less than $8 million in additional Rebates on Products that Victaulic invoiced during the term of the Agreement, but that had not yet shipped for resale by Ferguson such that the Rebates on such Products were not yet due to be paid as of the Agreement's termination date.

53. The Agreement expressly and unambiguously provides that such Rebates are earned as soon as the underlying Product purchases were invoiced by Victaulic, but Victaulic's obligation to pay them does not become due until the corresponding Products are later shipped for resale by Ferguson so that the precise Rebate amounts can be reconciled.

54. As of July 31, 2026, $3,100,831 of Product Rebates have become due based on such Product resales by Ferguson since April 3, 2026, and are now due and owing despite Victaulic's refusal to pay them.

55. Further, an additional approximately $5 million of Product Rebates are reasonably projected to become due and owing in the coming months as the remainder of Ferguson's subject Products are shipped for resale by Ferguson. Despite its anticipatory refusal to pay and attempted cancellation of such Rebates, Victaulic will owe payment of such Product Rebates at that time.

56. In total, Ferguson has suffered, and continues to suffer, damages in an amount to be determined at trial of this action but no less than $8 million as a result of Victaulic's foregoing and anticipatory breaches of the Agreement.

## DEMAND FOR JUDGMENT

WHEREFORE, Ferguson demands judgment against Defendant as follows:

i. As to Count I (Breach of Contract):

a. A declaration that Plaintiff is entitled under the Agreement to be paid all Rebates on all Products purchased by Plaintiff and invoiced by Defendant during the term of the Agreement, including such Products that shipped or will ship for resale by Ferguson and so become due to be paid on or after the effective date of the Agreement's termination, together with any additional declaratory relief necessary to establish the parties' respective rights and obligations under the Agreement;

b. Compensatory damages for Defendant's breach of the Agreement, in an amount to be determined at trial but no less than $8,000,000, representing Rebates earned by Plaintiff on Products invoiced by Defendant prior to termination of the Agreement -- including $3,100,831 in such Rebates on Products that shipped for resale by Ferguson between April 3, 2026 and July 31, 2026, and approximately $5,000,000 in such Rebates on Products that will ship for resale by Ferguson on or following August 1, 2026 -- together with any additional Rebates on Products invoiced prior to termination that become due and calculable following further shipment for resale;

c. Prejudgment interest at the applicable rate under Virginia law; and post-judgment interest pursuant to 28 U.S.C. § 1961; and

ii. Such other legal or equitable relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 25, 2026

Respectfully submitted,

**FERGUSON ENTERPRISES, LLC**
By Counsel

By: *<u>/s/ Robert W. McFarland</u>*

Robert W. McFarland (VA Bar No. 24021)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510
Tel. (757) 640-3700
Fax (757) 640-3701
rmcfarland@mcguirewoods.com

Richard Brosnick (*pro hac* forthcoming)
Alexandra N. Getsos (*pro hac* forthcoming)
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel. (212) 880-3800
Fax (212) 880-3965
richard.brosnick@akerman.com
alexandra.getsos@akerman.com

*Counsel for Plaintiff Ferguson Enterprises, LLC*